(A.R.D. 195)

JOSEF HELLER *v.* UNITED STATES

Entry No. 730224.

First Division, Appellate Term

(Decided August 2, 1965)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* and *Murray Sklaroff* of counsel) for the appellant.

*John W. Douglas,* Assistant Attorney General (*Morris Braverman,* trial attorney), for the appellee.

Before OLIVER, WILSON, and NICHOLS, Judges

WILSON, Judge: This is a proceeding in which we have before us for review a case decided by a trial judge of the third division of the United States Customs Court. The trial court in the case of *Josef Heller* v. *United States*, 52 Cust. Ct. 560, Reap. Dec. 10755, sustained the appraised value of a miscellaneous collection of secondhand merchandise.

On July 18, 1960, the appellant, Josef Heller, exported from Germany certain secondhand merchandise, consisting of a large accumulation of china, glass, metal, and other items referred to by the parties as secondhand bric-a-brac. Since the involved goods are not specified on the official final list set forth in T.D. 54521, the merchandise is concededly subject to appraisement under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. The extensive aggregation of secondhand goods was appraised on the basis of export value, as defined in section 402(b) of the tariff act, as amended. The appellant agrees that export value is the proper basis for appraisement in this case but insists that the appraiser, in making the official appraisement, acted unreasonably, and that, therefore, the said appraisement is erroneous.

The official appraisement under which the entered values were increased states: "All items pages 19 to 46 inclusive. Appraised at

invoiced unit values net, plus 50%, plus cost of packing." In appellant's brief, he states: "It is claimed only that the addition of 50% of the invoice values is erroneous."

The single judge before whom the reappraisement trial was held found that "Plaintiff has not established proofs showing that the appraised values are wrong. Therefore, it is not necessary to weigh his inadequate proofs with respect to the values which he claims." With this conclusion we agree. Section 500 of the Tariff Act of 1930 provides as follows:

**SEC. 500. DUTIES OF APPRAISING OFFICERS.**

(a) APPRAISER.—It shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe—

(1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power, any statement of cost or cost of production in any invoice, affidavit, declaration, or other document to the contrary notwithstanding;

\* \* \* \* \* \* \*

Since the sole contention of the appellant is that the line examiner representing the appraiser did not conform to the provisions of said section 500, *supra*, in making his advisory appraisal, in that he did not make a reasonable appraisement under the circumstances, a review of some of appellant's testimony and a summary of what the line examiner did in arriving at an advisory appraisal of the imported merchandise is hereinafter set forth, as disclosed by the record.

The appellant, at the reappraisement trial, testified that he started in the retail and wholesale secondhand business in 1945 in Germany; that he came to the United States in 1951 and a few months thereafter established a wholesale secondhand business in New York where he bought and sold "furniture and glass, porcelain, bone, everything." (R. 7.) The witness testified that he had brought in several shipments of similar merchandise prior to 1960 and that, in no instance, had the appraised value been higher than the entered value. On the question of how the appellant made his purchases abroad, he testified as follows:

Q. Now, when you make your purchases abroad, when you go to Europe and you buy, what kind of dealers do you buy from?—A. Dealers—what every dealer from United States, the most going here and buy. I just bought it just from dealers, everybody these dealers got for wholesale and for retail.

Q. The dealers sell wholesale and retail?—A. Yes, stores all over.

Q. I see. And do you go into their stores and look at the merchandise?—A. Yes, yes.

Q. And are their prices marked on the merchandise?—A. Yes, the most is marked at the price for retail, and then when I come in they give me a different price.

Q. Do you advise them that you are a wholesale purchaser?—A. Naturally, he knows me from every year, and gives it to me under price.

Q. In other words, he gives you a wholesaler's discount off the marked retail price?—A. Yes, yes.

Q. And have you had occasion to observe other people, as yourself, buying this merchandise?—A. Oh, yes, hundreds and hundreds of people all over there to buy.

\* \* \* \* \* \* \*

Q. Can other purchasers buy at the same prices that you pay?—A. Naturally, sure.

Q. And do you know the nature of the business which these other purchasers which you saw buy are in?

\* \* \* \* \* \* \*

A. A lot I know; a lot I don't know.

By Mr. Sklaroff:

Q. Those that you know.—A. Oh, yes.

Q. Are they in the same business as you are?—A. Yes, yes, yes.

Q. Now, when you buy I think you already explained to the Court, but tell us again when you buy do you pick up the items you buy?—A. I pick up myself, yes.

Q. Do you have a truck or something?—A. I have a station wagon, and I have a particular one place——

Q. And you buy at the plant, you pick it up, and then what do you do?—A. Then bring it to the shipper, and he packs in shipping everything together, all the merchandise together, to the United States.

Q. So that the prices you pay are at the store price?—A. Yes. [R. 9–11.]

It should be observed that nothing in Mr. Heller's testimony indicates what the retail price was, what was marked on the merchandise or any part of it, and what the price was that he paid for it. Neither is the quantity purchased at any particular store set forth. The merchandise as entered consisted of a vast accumulation of some 4,000 miscellaneous items. It would tax the imagination to think that Mr. Heller made 4,000 separate purchases. While Mr. Heller testified that other dealers purchased on the same terms that he did, yet, he gave the following information on cross-examination:

X Q. Do you know the price, the exact price that that man pays for merchandise?—A. No, no.

X Q. You do not know?—A. I don't have any interest to know what he pay. [R. 13.]

Obviously, therefore, we have no competent testimony worthy of any weight as to the price paid by Mr. Heller for the imported bric-a-brac or as to the price paid by other dealers for the used merchandise they bought. Among the official papers, is one, designated "Special Customs Invoice," reportedly signed by one Otlly Lasser, in which the imported merchandise is described under seven headings, to wit: "chinaware," "earthenware," "glassware," "metalware," "furniture, woodwork, mirrors," "music boxes," and "ivory carvings." There is nothing in the record to indicate who the signer of the special customs

invoice was or by what authority he acted, but it would appear that this paper was filed at the direction of or with the approval of the appellant. Also contained in the official files were 18 pages of type-written material upon which are listed the contents of 45 different "kiste" (crates or cases), evidently describing the imported merchandise. There follow on pages 19 through 46 what appear to be copies of commercial invoices from the various dealers from whom plaintiff made purchases, listing the items purchased with a price for each.

Samuel Leavitt, customs line examiner, who examined the imported used bric-a-brac, testified that his assigned line for examination included "second-hand bric-a-brac, which covers glassware, chinaware, earthenware, and also metal ware of various degrees of metal." Mr. Leavitt stated that he had been a line examiner of such merchandise since 1947. Relative to the examination of the imported goods he testified as follows:

Q. Mr. Leavitt, did you examine particularly the merchandise covered on pages 19 to 46?—A. Yes, the examination was made in two parts. On August 9, 1960 I visited the premises of Mr. Heller, at a warehouse located, I believe, on Columbus Avenue—I don't know the exact number—no, examined at, pardon me—examined at 250——

*   *   *   *   *   *   *

Mr. Sklaroff: We will concede Mr. Leavitt was at the premises.

*   *   *   *   *   *   *

A. Now, the first part of the examination took place on August 9, 1960. All the merchandise in the shipment was not available on that particular date, that is, it was not unpacked completely and stripped down of its outer wrappings.

On August 12, 1960, with Mr. Brengel, another line examiner assigned to this office, who was——

Judge Donlon: What office?

The Witness: Office of the Appraiser of Merchandise at New York, at the Port of New York. * * *

*   *   *   *   *   *   *

By Mr. Braverman:

Q. Just limit it to what you did yourself.

*   *   *   *   *   *   *

A. All right. On August 12, 1960, I made an additional visit to the warehouse to inspect and examine the balance of the shipment.

By Mr. Braverman:

Q. Did you examine every piece of merchandise on that entry covered from pages 19 to 46?—A. Not each and every piece personally, but they were all unpacked, available to inspect and evaluate the value of the various items.

Q. Everything that was in these packages was opened and on the table for inspection?—A. Absolutely.

Q. And thereafter you returned from the office and made your appraisement?—A. That is correct. [R. 19–21.]

On cross-examination, Mr. Leavitt testified that there were no prices on the items, just item numbers, and no indication on any of the

merchandise showing its price or value. He stated that he had to rely upon his personal knowledge of the particular commodities involved. He was then asked—

X Q. When you say your knowledge what do you mean?—A. Based on handling similar items since 1947, which identified themselves in my own mind pricewise from continual handling, inspecting and appraising that type of merchandise. [R. 21–22.]

Mr. Leavitt further testified that he had examined previous shipments of used merchandise brought in by Mr. Heller and that he had advanced the value of certain shipments above the entered value when he made his appraisals.

Under all the circumstances in this case, it would appear that the most unreasonable angle of the whole situation is the appellant's insistence that Mr. Leavitt should have examined and appraised individually every one of the 4,000 miscellaneous used items. As appears from the section of the law under which the line examiner acted, he had authority to estimate as best he could the value of the goods involved. He did see all the merchandise and did use his best judgment in making his appraisal.

Although it is conceded in this case that export value is the proper basis for appraisement, it was still incumbent upon the appellant at the trial to establish all the elements involved to prove the export value claimed by the appellant. He had the burden of proof to show the price "at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold, or in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States."

The court is of the opinion that the appraiser did follow reasonable procedures in estimating the value of the goods involved. Further, the burden of establishing the elements of the export value contended for by the appellant rests upon him. This burden he failed to discharge. We find no reversible error in the decision of the trial court.

The court finds the following to be the facts in this case:

1. The merchandise consists of a large aggregation of secondhand merchandise, consisting of some 4,000 individual items, including furniture, glassware, porcelain, and bone, exported from West Germany on July 18, 1960.

2. The merchandise was appraised on the basis of export value, which value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

3. The items appearing on pages 19 through 46 of the shipping list were appraised at unit values, net, plus 50 per centum, plus cost of packing.

4. The items which appear on pages 47 and 48 of a shipping list on file with the official papers are not involved in this proceeding.

5. The miscellaneous articles involved herein belong to a well-known line of merchandise—secondhand bric-a-brac; the said articles were displayed in groups for the examiner's inspection, and the examiner did make a reasonable inspection of the merchandise herein involved.

6. The importer, appellant herein, provided the examiner with no reliable information to assist him in ascertaining or estimating the true value of the imported merchandise, and, based upon his experience and upon his inspection of the merchandise, said examiner made a reasonable appraisement of the vast miscellaneous collection of bric-a-brac.

7. The prices at which said imported merchandise was sold or offered for sale either at retail or wholesale in the principal markets in the usual wholesale quantities for exportation to the United States cannot be ascertained or estimated from the information provided by the importer.

The court concludes as matters of law as follows:

1. That the export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the imported merchandise under consideration.

2. That the appraiser appraised the merchandise in unit quantity in which said merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power.

3. That the appellant herein has not established that the appraised values are incorrect.

4. That the appraised values represent the export value of the merchandise.

5. That the decision and judgment of the trial court should be affirmed.

Judgment will be entered accordingly.